FILED
JUN 11 2013
Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
)
IN RE: PETITION OF LUKE NICHTER    )    Action No. 12-mc-74 (RCL)
                                   )    (UNDER SEAL)
_____)

## EX PARTE MEMORANDUM OPINION

Now before the Court is the petitioner's Motion [1] to unseal records associated with *United States v. Liddy*, District Court docket number 1827-72. Upon consideration of the Motion [1], the government's opposition [10], petitioner's reply [11], the government's *ex parte* Surreply [notice of submission at docket entry 14],[1] the applicable law and for the reasons set forth below, the petition will be granted in part and denied in part.

I.    BACKGROUND

Petitioner Luke Nichter, a professor at Texas A&M University, submitted a letter asking the Court to unseal certain records associated with the Watergate scandal. Prof. Nichter would like to determine "why the Watergate break-in occurred, who ordered it, and what the burglars were looking for," and he believes the Court's files would resolve this historical mystery. Nichter Ltr. 1, Sep. 6, 2010, ECF No. 1.[2] He originally sought only documents at issue in *United States v. Liddy*, 354 F. Supp. 208 (D.D.C. 1972), specifically records disclosing what Alfred C. Baldwin, III, the individual tasked with monitoring the wiretap of the Democratic National Committee, overheard. *See* Nichter Ltr. 1, May 1, 2009, ECF No. 1. Later, Prof. Nichter

---

[1] Because the Court requested the government's Surreply *ex parte* and sealed, only a notice of submission appeared on the docket.

[2] Professor Nichter's correspondence with the Court between May 2009 and November 2011 was consolidated and posted on the docket as ECF entry number one. When citing to Professor Nichter's various letters, the Court will use both the date of correspondence and ECF number.

1

requested that the Court to unseal the entire file in *United States v. Liddy*, criminal docket number 1827-72.[3] Nichter Email to Jeremy Baron, Nov. 22, 2011, EFC No. 1.

The Department of Justice filed a Response to Prof. Nichter's petition agreeing that certain files should be unsealed but objecting to the unsealing of documents in three specific categories: (1) presentence reports and other documents implicating the privacy of living individuals; (2) documents reflecting the content of illegally obtained wiretaps; and (3) grand jury information. Prof. Nichter filed a Reply asking the Court to (a) immediately unseal all uncontested materials and order the National Archives and Records Administration ("NARA") to expeditiously review and release those records; to (b) hold in abeyance ruling on those documents whose unsealing and release the government objected to; and to (c) order an investigation into the extent of the breach of grand jury secrecy by Washington Post reporters during the Watergate era. Nichter Reply 1–2, ECF No. 11.

On November 2, 2012, the undersigned Judge granted in part and denied in part Prof. Nichter's request. *In re Petition of Luke Nichter*, Misc. No. 12-74 (RCL), 2012 WL 5382733, at *1 (D.D.C. Nov. 2, 2012). The Court's order unsealed all District Court records that the government did not object to unsealing. *Id.* The Court also ordered the Department of Justice to submit, *ex parte* and under seal, copies of all District Court records it believed should remain sealed. Prof. Nichter's request that the Court order an investigation into the breach of grand jury secrecy during the Watergate era was denied. *Id.*

In accordance with that order, on November 30, 2012, the NARA released and made available online approximately 950 pages of documents. On December 10, 2012, the Justice Department submitted the requested surreply along with copies of documents it believes should

---

[3] Professor Nichter also requests documents associated with D.C. Circuit docket number 73-1020. *See* Nichter email to Jeremy Baron, Nov. 22, 2011, ECF No. 1. However, this Court has no jurisdiction over the D.C. Circuit's records.

remain under seal. The government argues that 15 sets of documents, marked as exhibits "A" thru "O," should remain sealed—in whole or in part—because they disclose private, personal information, would constitute a breach of grand jury secrecy, or would reveal information obtained by an illegal wiretap.

## II. DISCUSSION

### A. Presentence Investigative Reports and Other Documents Containing Personal Information of Living Individuals

After a defendant has pleaded guilty or been convicted, the Probation Office conducts a presentence investigation and creates a Presentence Investigative Report ("PSR")[4] to aid the sentencing court in carrying out its function. *See* Fed. R. Crim. P. 32(c)–(d). The PSR must contain, *inter alia*, an overview of the defendant's personal history and characteristics, including any prior criminal record, the defendant's financial background, and family or personal circumstances that might have affected the defendant's behavior. *Id.* 32(d)(2). In practice, PSRs generally contain a summary of the facts and circumstances giving rise to the offense, an assessment of the defendant's mental and physical health, and other background information including the defendant's educational attainment, military service record, work history, history of substance abuse, and a statement regarding the defendant's cooperation with authorities and acceptance of responsibility. However, the PSR *may not* contain any confidential sources of information, any information that, if disclosed, might result in physical or other harm to the defendant or others, or any diagnoses that, if disclosed, might seriously disrupt a rehabilitation program. *Id.* at 32(d)(3).

---

[4] This Court uses the abbreviation "PSR" for Presentence Investigation Reports; however, other courts abbreviate the terms as "PSIR," *see, e.g., United States v. Huckaby*, 43 F.3d 135 (5th Cir. 1995), or "PSI," *see, e.g., United States v. Gomez*, 323 F.3d 1305 (11th Cir. 2003).

PSRs are presumptively confidential and the Court is only required to disclose them to the defendant, his attorney, and the government.[5] *Id.* 32(e)(2). However, PSRs are court documents, and the district court may release them at its discretion. *See, e.g., United States v. Gomez*, 323 F.3d 1305, 1307–08 (11th Cir. 2003) (per curiam). Because PSRs contain sensitive information and because they do not have to conform to the rules of evidence and may contain errors,[6] courts are cautious about disclosing them to third parties. They are generally disclosed only under limited circumstances, typically when the third-party shows a special need. *See U.S. Dep't of Justice v. Julian*, 486 U.S. 1, 12 (1988). This reluctance is rooted in common sense and policy—courts fear that making PSRs publicly available may have a chilling effect on individuals whose information is contained in the reports, that errors and information about uncharged crimes contained in PSRs may needlessly harm a defendant's reputation, that PSRs may contain information gathered by the grand jury that is otherwise secret, and that PSRs might include facts obtained from confidential informants. *United States v. Huckaby*, 43 F.3d 135, 138 (5th Cir. 1995); *see also United States v. Iqbal*, 684 F.3d 507, 510 (5th Cir. 2012) (discussing policy considerations).

The D.C. Circuit, in an unpublished opinion, adopted a "compelling need" balancing test to determine when third-party release is appropriate. *See United States v. Colwell*, 304 Fed. App'x 885, 886 (D.C. Cir. 2008) (citing *United States v. Charmer Indus., Inc.*, 711 F.2d 1164, 1175 (2d Cir. 1983)); *see also Huckaby*, 43 F.3d at 138–39 (adopting the compelling need test and noting that the district court had "clearly balanced the desirability of publication over the

---

[5] Of course, the court may disclose any part of or all of a PSR during the public sentencing hearing.
[6] While Rule 32 allows the defendant to object to errors in the PSR and requires the Court to resolve any factual disputes concerning a PSR's accuracy, PSRs are "not usually rewritten to remove misinformation." *United States v. Huckaby*, 43 F.3d 135, 138 (5th Cir. 1995). However, mandatory disclosure to defendants was not codified in Rule 32 until 1974, after the presentence reports at issue here were created. *United States v. Schlette*, 842 F.2d 1574, 1580 (9th Cir. 1988) (citations omitted). Thus, it is very likely that defendants in this case never had the opportunity to review their presentence reports and object to any misinformation they might contain.

need for confidentiality"); *United States v. Corbitt*, 879 F.2d 224, 239 (7th Cir. 1989) (holding that PSRs should only be released where a "compelling particularlized need for disclosure is shown"). This test requires the party seeking disclosure to show a "compelling need for disclosure to meet the ends of justice" that outweighs the privacy interests of the defendant and the policy interests of the court. *Colwell*, 304 Fed. App'x at 886.

The Fifth Circuit in *Huckaby* determined that clarifying the public record justified releasing a defendant's PSR. Huckaby, a state district judge in Louisiana, came under investigation for tax evasion. *Huckaby*, 43 F. 3d at 136. His case received considerable local publicity and the community was deeply divided over whether he should have been prosecuted at all. *Id.* at 137. Some in the community, including civic leaders, felt that Huckaby was being prosecuted because he was African-American. *See id.* After reading a portion of the PSR into the record, Huckaby's sentencing judge concluded: "Because of the widespread misconceptions about this case, I'm going to take the unusual step of filing the presentence report, together with your objections, into the record, for anyone who is interested in the truth." *Id.* Notably, the PSR included information related to uncharged crimes. *Id.* at 136 (although Huckaby was only charged with one misdemeanor tax evasion count, his PSR stated that he failed to file federal and state income tax returns for at least twelve years). Calling the district judge's actions "bold" and "extraordinary," the Fifth Circuit blessed the district court's balancing of the competing interests and noted that the district court acted in the best interest of the community. *Id.* at 139–40.

In the present case, the government argues that Prof. Nichter "has not demonstrated why disclosure of . . . [the PSRs in *Liddy* are] required to meet the ends of justice, or provided any other reason why the public interest requires unsealing." Gov't's Resp. 8–10, ECF No. 10. The Court disagrees. Prof. Nichter stated that his interest in the documents emanates from the fact

5

that he is "an American citizen and a stakeholder in our democracy." Nichter Reply 2, ECF No. 11.

> The subject of Watergate has attracted enormous attention over the past 40 years. Some writers have been labeled anti-Nixon. Some worked for President Nixon. Some have been called conspiracy theorists. Other have been labeled revisionists. . . .
> The simple fact remains that—even some forty years after the break-in arrests led to the demise of the Nixon presidency. . . historians still have no definitive answers as to the rationale for the Watergate break-in . . . .

*Id.* It is clear to the Court that knowledge of all the facts and circumstances surrounding the Watergate break-in, an event that led to the imprisonment of numerous Nixon administration officials and the only resignation of a President of the United States, will help correct misinformation and dispel myths and baseless conspiracy theories surrounding this sad episode of American history. *See id.*

Releasing the PSRs also serves another compelling public interest required to meet the ends of justice—publicizing actions that threatened the very nature of our democratic system of government. Holding democratic office is a privilege of citizenship and shows society's trust in the office holder; when that trust is broken, our democratic system of government suffers as a consequence. Our history of open criminal trials and public identification of defendants puts society on notice that crimes do not go unpunished and illegal acts cannot be hidden from the community. In high profile public corruption cases in particular, the publication of court records, even those that would normally remain under seal, places politicians and their allies on notice that they will be held responsible for their actions.

The *Liddy* file contains four PSRs: those of Virgilio Gonzalez, Engenio Martinez, Bernard Barker, and Frank Sturgis.[7] These are found behind "Tab N" in the government's *ex*

---

[7] The Court has asked the Probation Office to search its records for Messrs. Liddy, Hunt, and McCord's PSRs. The Court will consider releasing those PSRs if they become available.

*parte* submission.[8] After examining the PSRs in camera, the Court can find no obvious information implicating grand jury secrecy or the identity of confidential sources. *See Huckaby*, 43 F.3d at 138. Messrs. Barker and Sturgis are deceased; therefore, the release of their PSRs does not transgress upon their privacy interests. S*ee United States v. Schlette*, 842 F.2d 1574, 1580–81 (9th Cir. 1988) (holding that privacy interests implicated by disclosure of PSRs may be mitigated in a given case and do not apply when the subject of the report is deceased). While Messrs. Gonzalez and Martinez are still living, the public's interest in clarifying the historical record and further identifying the facts that led to the resignation of President Nixon outweigh their individual privacy interests.

Therefore the Court will order NARA to release all PSRs contained in the *Liddy* file. However, because medical and psychological information of living individuals, including Messrs. Gonzalez and Martinez, are included in the reports, and disclosure of this information would provide no benefit to the public, the Justice Department, working with NARA, will have thirty days to redact this information before releasing the PSRs. *See Corbitt*, 879 F.2d at 299 ("[T]he court should limit disclosure to those portions of the report which are directly relevant to the demonstrated need.").

Other documents containing personal correspondence and information relating to the health and family circumstances of one or more of the defendants shall be unsealed. However, NARA shall make appropriate redactions in order to protect the personal privacy of living individuals.

---

[8] Tab N also contains Bureau of Prisons evaluations for Messrs. Barker, Gonzalez, Martinez and Sturgis. Those reports were prepared pursuant to 18 U.S.C. § 4208(B) (repealed 1984). All four reports have been partially redacted to protect family and medical history information and have been released. Gov't's Reply 10–11, Notice at ECF No. 14.

### B. Release of Illegally Intercepted Wiretap Information

Mr. Nichter asks the Court to unseal records containing descriptions of information obtained through Alfred C. Baldwin III's monitoring of the illegal wiretap placed at the Democratic National Committee. Nichter Ltr. 2, May 1, 2009, EFC No. 1; Nichter Reply 4. He argues that much of this information is likely already public, that Earl Silbert, the Assistant United States Attorney who served as the prosecutor in *Liddy*, attempted to introduce this material during trial, and that the public interest will be served by completing the historical record. The government maintains that the Court may not release any information that discloses the contents of an illegal wiretap. Gov't's Resp. 10–18.

The Court agrees with the government. Title III of the Omnibus Crime Control and Safe Streets Act of 1968 ("Title III"), codified at 18 U.S.C. §§ 2510–2520, prohibits disseminating the contents of an illegal wiretap. This prohibition applies to private conduct as much as to the conduct of the government. *Chandler v. U.S. Army*, 125 F.3d 1296, 1298 (9th Cir. 1997). Under the statute, wiretap "contents" include "any information concerning the substance, purport, or meaning of that [intercepted] communication." § 2510(8). No public or historical interest exception allowing disclosure exists. Nor does Prof. Nichter or the public have a First Amendment right to access documents containing illegally obtained wiretap information.[9]

---

[9] Professor Nichter cites Judge Rakoff's opinion in *In the Matter of Application of the New York Times Company to Unseal Wiretap & Search Warrant Materials* ("*Spitzer I*"), to support his application for the release of documents. Nichter Letter 1–2. However, *Spitzer I* is inapposite. In that case, Judge Rakoff acknowledged that Title III governed access to wiretap applications, but found that the right of access to judicial records—records related to the government's investigation of the Emperor's Club V.I.P., a prostitution and money laundering ring whose clientele included former New York Governor Eliot Spitzer—outweighed the government's competing interests. *Spitzer I*, 600 F. Supp. 2d. 504, 505–09 (S.D.N.Y. 2009). However, the Second Circuit reversed Judge Rakoff, holding that Title III supersedes any common law or First Amendment right of access to judicial records. *In the Matter of Application of the New York Times Company to Unseal Wiretap & Search Warrant Materials* ("Spitzer II"), 577 F.3d 401, 405, 411 (2d Cir. 2009). Moreover, *Spitzer I* dealt with access to a legally submitted wiretap application as opposed to the contents of an illegal wiretap.

However, the names of those overheard on the illegal wiretap may be released. Section 2510 was specifically amended in 1986 to "exclude from the definition of the term 'contents' the identity of the parties or the existence of the communication." S. Comm. on Judiciary, Electronic Communications Privacy Act of 1986, S. Rep. No. 99-541, at 13 (1986), *reprinted in* 1986 U.S.C.C.A.N. 3555, 3567. The Senate report noted that the change "distinguishes between the substance, purport or meaning of the communication and the existence of the communication or transactional records about it." *Id.* Therefore, to the extent wiretap information is not otherwise sealed because it appears in grand jury documents, the names of those overheard on the illegal wiretap shall be released.[10]

Absent future congressional action allowing the disclosure of illegally obtained wiretap information that is historically significant, this Court has no authority to release any information that would identify the contents of the wiretaps in question. Therefore, Prof. Nichter's request for documents identifying the contents of those wiretaps will be denied.

C. **Grand Jury Information**

The *Liddy* file also includes transcripts of, and information obtained during, grand jury proceedings. Specifically, behind Tab B is the transcript of the grand jury's ███████████ proceeding. The 12-page transcript is a record of [deleted by Court] Assistant United States Attorney Earl Silbert's questioning ███████████████████████████
███████████████████████████████ Behind Tab F are documents submitted *in camera* on June 17, 1973 ("Exhibits B and C"). Exhibit C consists of portions of

---

[10] The Court recognizes that releasing the names of aggrieved parties to an illegal wiretap is unusual. Indeed, judicial policy counsels against routinely releasing such information because the identities of individuals whose privacy was illegally breached should be protected. Even under FOIA, the Court routinely allows such information to be redacted. *Cf. Queen v. Gonzales,* Civ. No. 96-1387 (JAR), 2005 WL 3204160, at *5 (D.D.C. Nov. 15, 2005) (holding that the FBI's appropriately applied FOIA Exemption 3 to withhold the identities of individuals overheard on a wiretap). However, given the historical relevance of the current petition combined with the fact that some if not all of the targets of the wiretap have been publically identified, *see, e.g., Wells v. Liddy,* 37 Fed. App'x 53 (4th Cir. 2002), the Court deems disclosure appropriate in this unique instance.

███████████ testimony before the grand jury. Behind Tab K is a court transcript from January 24, 1973, which includes grand jury witness names. Where the fact of a witness's grand jury testimony was introduced or made public, NARA has left that name unredacted. Gov't's Surreply 9. However, NARA redacted portions of this document that would reveal a witness or potential witness's appearance that was not previously public. *Id.* Behind Tab L is the transcript of a proceeding held in Judge Sirica's chambers at approximately 2:00 p.m. on July 24, 1973. This transcript contains limited redactions, which NARA believes are necessary to comply with Federal Rule of Criminal Procedure 6(e). *Id.* at 10. Behind Tab M is the transcript of a proceeding held in Judge Sirica's chambers at 10:00 a.m. on September 17, 1973. It contains one very limited redaction related to grand jury testimony.

Prof. Nichter asks the Court to release this information in accordance with this Court's decision in *In re Petition of Kutler*, 800 F. Supp. 2d 42, 43 (D.D.C. 2011). Nichter Reply 5. Prof. Nichter also speculates that some of the information contained in the Court's grand jury files has already become part of the public record. *Id.* at 3; *see also id.* Exhibits A–C.[11] The government objects to releasing any grand jury material not used at trial, arguing that "no statute or rule provides for disclosure of grand jury information for reasons of historical interest." Gov't's Resp. 18.

In *In re Petition of Kutler*, Prof. Kutler and several major historical groups petitioned this Court to release the transcript of President Richard Nixon's grand jury testimony and related materials of the Watergate Special Prosecution Force ("WSPF"). 800 F. Supp. 2d at 43. The Justice Department objected on the same grounds as those raised here. *Id.* The Court

---

[11] Attachment A is a copy of Jeff Himmelman's article, *The Red Flag in the Flowerpot*, published in New York Magazine on April 29, 2012. Attachment B is a printout of seven pages of typed notes prepared by Carl Bernstein that Professor Nichter believes were made following his contact with a grand juror. These are available at http://nymag.com/news/features/ben-bradlee-z-memo-2012-5/. Attachment C comprises pages 201-210 of Jeff Himmelman's book, "Yours in Truth, A Personal Portrait of Ben Bradlee" published by Random House in 2012.

10

determined that grand jury secrecy, codified by Federal Rule of Criminal Procedure 6(e), "is not without exceptions."[12] *Id.* at 44. The Court found that historical interest could trigger the "special circumstances exception," which is grounded in the court's inherent supervisory authority over court records. *Id.* at 47–48. The non-exhaustive list of factors that a court must consider before releasing grand jury records based on the special circumstances exception include:

> (i) the identity of the party seeking disclosure; (ii) whether the defendant to the grand jury proceeding or the government opposes the disclosure; (iii) why disclosure is being sought in the particular case; (iv) what specific information is being sought for disclosure; (v) how long ago the grand jury proceedings took place; (vi) the current status of the principals of the grand jury proceedings and that of their families; (vii) the extent to which the desired material—either permissibly or impermissibly—has been previously made public; (viii) whether witnesses to the grand jury proceedings who might be affected by disclosure are still alive; and (ix) the additional need for maintaining secrecy in the particular case in question.

*Id.* at 47–48 (citing *In re Petition of Craig*, 131 F.3d 99, 106 (2d Cir. 1997)). After balancing these factors, the Court concluded that releasing President Nixon's grand jury testimony was justified. *See id.* at 48–50.

While the materials here might be of historical significance, the facts of this case are quite different from those in *Kutler* and weigh against disclosure.[13] In *Kutler*, only President

---

[12] The government disagrees with the Court's analysis in *In re Kutler* and believes that Court may not look beyond the plain language of Federal Rule of Criminal Procedure 6(e) when deciding whether to release grand jury materials. Gov't's Resp. 18–23. For reasons expressed in *In re Kutler*, the Court believes that it does, indeed, have the authority to look outside Rule 6(e) and will apply the same balancing test here. *See In re Petition of Kutler*, 800 F. Supp. 2d 42, 44–48 (D.D.C. 2011).

[13] The government notes that a "consortium of historical associations and Watergate scholars" joined Professor Kutler's petition and it asserts that Prof. Nichter's petition lacks such "broad-based and unified support." Gov't's Resp. 24. The nature and number of the parties seeking disclosure is certainly an important factor for the Court to consider. However, the simple fact that Professor Nichter's request was not joined by other parties does not mean that his request lacks the support of historians and other groups interested in the Watergate scandal. The "unified support" evident in Kutler may reveal as much about Professor Kutler's personal connections and outreach efforts as it does about the "broad-based" interest in the documents. The relevant inquiry is not the number of parties seeking disclosure but the requester's association with and intended use of grand jury materials. In both these cases, the parties seeking disclosure were ultimately interested in learning and exposing as much information as possible about a scandal that rocked the foundations of American democracy.

Nixon's testimony was at issue, the fact that he testified before the grand jury was well known, and his death in 1994 vitiated at least some of the privacy interests protected by grand jury secrecy. *See id* at 49. Although the information sought by Prof. Nichter is more than forty years old, at least one of the subjects of grand jury testimony—███████—is still living and these documents should remain sealed to protect his privacy. It is also possible that other individuals—grand jurors and witnesses—named in the materials are still living. Revealing the names of Watergate grand jurors and grand jury witnesses could bring these individuals or their families unwanted media attention. If interviewed, living former grand jurors and witnesses may divulge information constituting a further breach of grand jury secrecy.[14]

Prof. Nichter speculates that at least some of the information contained in the sealed documents "has already become part of the public record." Nichter Reply 3. ███████ ███████████████████████████████████ Rule 6(e)(6) requires that "[r]ecords, orders, and subpoenas relating to grand-jury proceedings" remain sealed only "to the extent and as long as necessary to prevent the unauthorized disclosure" of grand jury matters. Material can "'los[e] its character as Rule 6(e) material,'" when it has been disclosed by a party and widely disseminated by the media. *In re Grand Jury Subpoena, Judith Miller*, 493 F.3d 152, 154 (D.C. Cir. 2007) (quoting *In re North*, 16 F.3d 1234, 1245 (D.C. Cir. 1994)) ("Although not every public disclosure waives Rule 6(e) protections, one can safely assume that the 'cat is out of the bag' when a grand jury witness . . . discusses his role on CBS Evening News."). ███████████████████████████

---

[14] Disclosure may be appropriate following the death of all persons named in the grand jury materials. The Court would also reconsider its ruling if it was presented with evidence that the named individuals had consented to release.

████████████████████████████████

████████████████████████████████ Thus, releasing the Transcript of the grand jury's ██████████████ proceeding (found behind Tab B) would reveal information that remains secret to this day.

Moreover, Prof. Nichter seeks information related to the motivation behind the Watergate break-in. Nichter Ltr. 1, Sep. 6, 2010, ECF No. 1. After reviewing the grand jury materials in camera, the Court does not believe the information contained therein would help resolve any ambiguities in the historical record or bring Prof. Nichter any closer to solving the questions he presents. After weighing the *Craig* factors, the Court determines that the calculus falls in favor of the government's position and will not unseal any grand jury materials.

### III. CONCLUSION

Prof. Nichter's quest to discover the ultimate truth behind Watergate is laudable. Unfortunately, the law does not allow the Court to release all the requested information. The Court will unseal the PSRs and some personal documents but will allow NARA to make appropriate redactions. Only the names of individuals overheard on the illegal wiretaps will be unsealed. The Court will likewise order that grand jury materials remain under seal. An Order consistent with this Memorandum Opinion shall issue this date.

SO ORDERED this 13th day of May 2013.

*Royce C. Lamberth*
ROYCE C. LAMBERTH
Chief Judge
United States District Court